JACKSON LEWIS LLP
   59 Maiden Lane
   New York, New York 10038-4502
   (212) 545-4000
Attorneys of record for Defendants:
   Felice B. Ekelman (FE 5692)
   Peter C. Moskowitz (PM 8845)
   Ravindra K. Shaw (RS 1944)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CORINNE B. PASQUALINI,

                   Plaintiff,

        -against-

MORTGAGEIT, INC., d/b/a IPI
SKYSCRAPER MORTGAGE, MARK
PAPPAS, RICHARD SCHULMAN CHERYL
COHEN AND PATRICIA GORMAN,

                  Defendants.

Index No.  05 CV 9714 (WCC)

**DEFENDANTS' LOCAL RULE
56.1 STATEMENT OF
UNDISPUTED MATERIAL
FACTS**

---

       Defendants MortgageIT, Inc., Mark Pappas, Richard Schulman, Cheryl Cohen and

Patricia Gorman ("Defendants") submit this Statement of Undisputed Material Facts, pursuant to

Local Rule 56.1 of the United States District Court Southern District of New York, in Support of

Defendants' Motion for Summary Judgment.

## BACKGROUND ON DEFENDANTS

### A.    The Defendants

1.    Defendant MortgageIT was a mortgage broker with its principal place of business in New York City and a branch office located at 711 Westchester Avenue in White Plains, New York ("White Plains Office").   (Cohen Aff. ¶2)[1].

2.    Deutsche Bank purchased Defendant MortgageIT and the transaction closed on January 1, 2007 – well after the events in this case occurred.  (Holmes Aff. ¶2).

3.    Defendant Mark Pappas was the head of retail sales at MortgageIT during the time period Plaintiff was employed by MortgageIT.   Mr. Pappas was based in the New York City office but his oversight responsibilities included the White Plains Office.  (Pappas dep. 20; Cohen Aff. ¶4).[2]

4.    Defendant Cheryl Cohen was hired as the Branch Manager of the White Plains Office in March 2002 and remained the Branch Manager during the time period that Plaintiff was employed by MortgageIT.  Ms. Cohen was Plaintiff's supervisor.  (Cohen dep. 5-6, 73-74; Cohen Aff. ¶¶3, 5).

---

[1]    References to "Cohen Aff. __" are to the Affidavit of Cheryl Cohen, sworn to on December 4, 2008, and submitted herewith. References to "Cuti Aff. __" are to the Affidavit of John Cuti, Esq., sworn to on December 2, 2008, and submitted herewith.  References to "Holmes Aff. __" are to the Affidavit of Rebecca Holmes, sworn to on December 4, 2008, and submitted herewith. References to "Ex. [letter]" are to the Exhibits attached to the Cuti or Holmes affidavits. References to "Ex. [number]" are to the Exhibits attached to the Affidavit of Peter C. Moskowitz, Esq., (Moskowitz Aff.) sworn to on December 12, 2008, and submitted herewith.

[2]    References to "Pl. dep. __" are to the deposition transcript of Plaintiff attached as Exhibit "1" to the Moskowitz Aff.  References to "Schulman dep. __," "Cohen dep. __," "Pappas dep. __," "Ahern dep. __," "O'Brien dep. __," "Gorman dep. __," "Kaplan dep. __," "Gega dep. __," "Bach dep. __," and "Bierfreind dep. __," are to the transcripts of the depositions of Richard Schulman, Cheryl Cohen, Mark Pappas, Debra Ahern, Maureen O'Brien, Patricia Gorman, Alison Kaplan, Joseph Gega, Suzanne Bach, and Annette Bierfriend attached as Exhibits "2," "3," "4," "5," "6," "7," "8," "9," "10," and "11" to the Moskowitz Aff., respectively.

5.     Defendant Richard Schulman was as a loan officer in the New York City office and transferred to the White Plains Office in or about January 2003 and remained in that position until June 14, 2004.  (Cohen dep. 95-97, Ex. 31).

6.     Defendant Patricia Gorman was a loan officer at the White Plains Office from approximately April 2002 through 2004.  (Gorman dep. 7-8).

**B.**     **MortgageIT's EEO Policies and Training**

7.     MortgageIT was an equal opportunity employer. (Ex. 12, p.5; Ex. 13, p. 5).  It was MortgageIT's policy and practice to make all employment decisions without regard to gender or any other statutorily protected status.  (Id.; Pl. dep. 163-64).

8.     MortgageIT had an Employee Handbook that contained its equal employment opportunity policies, including a sexual harassment policy, complaint procedure and prohibition against retaliation.  (Ex. 12, pp.5, 49; Ex. 13, pp. 5, 50; Holmes Aff. ¶4).

9.     MortgageIT distributed its Employee Handbook to all employees. (Holmes Aff. ¶¶3, 4, 7 ).

10.     MortgageIT's policies were available to all employees on-line.  (Cohen dep. 61; Holmes Aff. ¶7).

11.     MortgageIT had a complaint procedure for employees to utilize to report any type of alleged harassment, discrimination or retaliation to the employee's supervisor, the manager of the employee's department or the head of Human Resources. (Ex. 14; Ex. 12, p.5; Ex. 13, p. 5).

12.     Plaintiff received a copy of MortgageIT's sexual harassment policy at the outset of her employment and signed an acknowledgment that she read and agreed to abide by the policies and procedures.  (Ex. 14).

13.    In the summer and fall 2003, MortgageIT provided EEO training, which specifically included sexual harassment training, to certain of its branch offices. (Holmes Aff. ¶6, Ex. A).

14.    MortgageIT provided EEO training, including training on sexual harassment, to the employees of the White Plains office on September 17, 2003. (Holmes Aff. ¶6, Ex. A). Both Plaintiff and Mr. Schulman attended this training and signed acknowledgments that they understood and agreed to abide by the terms of MortgageIT's EEO, sexual harassment, and other policies. (Exs. 15, 16).

15.    In addition to attending a training session, the employees of the White Plains office received written materials on September 17, 2003. (Holmes Aff. ¶6, Ex. A).

## PLAINTIFF'S EMPLOYMENT AT MORTGAGEIT

### A.    April 2002 – Plaintiff is Hired as a Loan Processor

16.    Plaintiff was hired as a loan processor for the White Plains office in April 2002. (Pl. dep. 31; Cohen dep. 73-75; Ex. 17).

17.    Plaintiff was an at-will employee of MortgageIT. (Ex. 17).

18.    Plaintiff was hired by Cheryl Cohen. (Pl. dep. 30-31; Cohen dep. 73-75)

19.    Prior to working at MortgageIT, Plaintiff worked with Ms. Cohen as a loan processor at Manhattan Mortgage Co. ("Manhattan Mortgage"). (Pl. dep. 30; Cohen dep. 14-15).

20.    Maureen O'Brien was a loan processor with Plaintiff at Manhattan Mortgage and she was training Plaintiff to process loans at the time Plaintiff left Manhattan Mortgage for MortgageIT. (O'Brien dep. 85-86).

21.     During Plaintiff's employment with MortgageIT, Ms. Cohen was always Plaintiff's immediate supervisor.  (Pl. dep. 35).  Ms. Cohen evaluated Plaintiff, directed her work, made recommendations regarding her compensation, and promoted her.  (Pl. dep. 35-36).

**B.      The Business of the White Plains Office**

22.     As Branch Manager of the White Plains Office, Ms. Cohen reported to Mark Pappas.  (Pappas dep. 20-21).

23.     The business of the White Plains Office was to originate and close residential loans, including mortgages and home equity loans.  (Cohen Aff. ¶7).

24.     Loan officers were responsible for originating loans, i.e., identifying a home purchaser or homeowner seeking a mortgage or home equity loan and matching them with a lender for their loan. (Cohen Aff. ¶8).

25.     The loan officers reported directly to Ms. Cohen.  (Cohen dep. 72, 132).

26.     To assist loan officers in originating and closing the loans they originated, MortgageIT employed support staff at the White Plains Office during Plaintiff's employment. (Cohen Aff. ¶10).

27.     Loan processors assisted loan officers in completing, submitting and closing the loans originated by the loan officers.  Loan processors were responsible for obtaining the information that was needed from borrowers in order to complete and submit the loan to the lender, following up with the lender on the status of the loan application and coordinating any additional information needed in order to close the loan.  (Cohen Aff. ¶11).

28.     Loan closers assisted the loan officers in ensuring that the loans submitted by the loan processors were closed. (Cohen Aff. ¶12).

29.     Administrative assistants were provided to the top producing loan officers and their job was to provide assistance to the loan officers as needed to help them keep their loan pipeline and accordingly their business up and running.  (Cohen Aff. ¶13; Ahern dep. 64).

30.     The Processing Manager was also referred to as the Operations Manager in the White Plains Office. (Cohen Aff. ¶14).

31.     The job responsibility of the Processing Manager was, *inter alia*, to supervise the support staff, manage the workflow of the loan processors, closers and openers, assist the loan processors with any questions or issues in the processing of loans and to process loans for loan officers.  (Cohen Aff. ¶15).

32.     The White Plains Office also employed receptionists and file clerks to assist in the efficient functioning of the office.  (Cohen Aff. ¶16).

33.     Brokering residential mortgages is an extremely competitive, time sensitive and stressful business.  (Cohen Aff. ¶17; Cohen dep. 170, 173-74; Pappas dep. 82-83; O'Brien dep. 41, 50).

34.      Loan officers are compensated on the basis of the commissions they earn from closing loans and they only get paid on loans that close.  (Cohen Aff. ¶18; Pappas dep. 82-83).

35.     Home purchasers are almost always under pressure to close their loans and expect that their mortgages will proceed quickly and without any problems.  (Cohen Aff. ¶19).

36.     Homeowners who are refinancing existing mortgages and/or seeking home equity loans or lines of credit similarly expect their loans to close promptly and without any issues.  (Cohen Aff. ¶20).

**C.**     **Plaintiff's Job Performance in 2002**

37.     When she joined MortgageIT, Plaintiff started processing for Mira Dick, one of the top producing loan officers at MortgageIT.  (Cohen dep. 119; Cohen Aff. ¶21).

38.     Ms. Dick became dissatisfied with Plaintiff's job performance and requested that Plaintiff no longer process her loans.  (Cohen dep. 120; Cohen Aff. ¶22).

39.     In 2002, other loan officers at the White Plains Office, including Jeff Deldetto, Debbie Schacter, Marilyn Rowley, Bill Christiano, Peter Gabel and Andy Caminsky complained to Cheryl Cohen that Plaintiff was not properly or timely processing their loans.  (Cohen dep. 120-23; Cohen Aff. ¶23).

**D.**     **The Refinancing Frenzy in 2002 and 2003**

40.     The period beginning in mid 2002 and continuing through the end of 2003, was one of the busiest in the history of the mortgage business as homeowners refinanced their mortgages at an unprecedented rate.  (Cohen dep. 75, 119; Gorman dep. 86; Cohen Aff. ¶24).

41.     The number of loans handled by the White Plains Office exploded and the office was operating above its capacity. (Cohen Aff. ¶25; Cohen dep. 122).

42.     Ms. Cohen hired as many loan officers and support staff as she could to process and close the loans being handled by the White Plains office, but experienced and capable processors and closers were difficult to find.  (Cohen dep. 75; Cohen Aff. ¶25).

43.     As a result of the vast increase in the number of loans, Ms. Cohen determined that she needed a Processing Manager to supervise the work flow and increased support staff. (Cohen Aff. ¶26).

44.    Ms. Cohen promoted Plaintiff to the position of Processing Manager in or about February 2003.  (Pl. dep. 35-36; Ex. 18).  As Processing Manager, Plaintiff was "second in charge" in the White Plains office.  (Pl. dep. 36).

45.    Ms. Cohen promoted Plaintiff despite complaints she had received from numerous loan officers in the White Plains Office concerning Plaintiff's lack of knowledge of the loan industry and her unsatisfactory performance as a loan processor.  (Cohen dep. 119-23, 143, 146; Cohen Aff. ¶¶23, 27).

46.    At the time, Ms. Cohen believed Plaintiff's statements to her that she was processing a large number of loans and that the loan officers' complaints were a result of the fact that their loans were not being processed as quickly as they wanted, not that she was doing anything wrong.  (Cohen dep. 137, 141; Cohen Aff. ¶28).

47.    Ms. Cohen chose to believe Plaintiff's explanation of the nature of the loan officer complaints because she trusted her, the office was very busy, and it was her experience that loan officers are rarely satisfied with the speed with which their loans are processed and closed. (Cohen dep. 141, 147; Cohen Aff. ¶29).

**E.    Plaintiff's Job Performance was Unsatisfactory in 2003 and 2004**

48.    In 2003, nearly all of the loan officers at the White Plains Office complained to Ms. Cohen that Plaintiff was not doing her job as the Processing Manager.  They told Ms. Cohen that Plaintiff did not have the knowledge to help them or the other processors with problems or issues that arose in connection with their loans, that she did not efficiently process the loans she was in charge of, and that she was constantly out of the office during business hours and therefore unavailable to assist them.  (Cohen dep. 119-23, 143-44, 147; Cohen Aff. ¶30).

49.     When Ms. Cohen asked Plaintiff about the issues raised by the loan officers, Plaintiff told Ms. Cohen that the loan officers' complaints were unfounded and pointed to the number of loans that were being processed and closed by the White Plains Office. (Cohen dep. 141; Cohen Aff. ¶31).

50.     Ms. Cohen continued to believe Plaintiff's version of events and did not investigate the loan officers' complaints because she was so busy working on loans. (Cohen dep. 137, 141-42; Cohen Aff. ¶31).

51.     In June 2003, Ms. Gorman became dissatisfied with Plaintiff's job performance because Plaintiff was not taking any steps or doing any work to ensure that Ms. Gorman's pipeline of loans was timely progressing from application to closing. (Gorman dep. 69, 73-78, 86-88, 99-101; Cohen dep. 120; Ex. 19).

52.     Ms. Gorman confronted Plaintiff orally and in writing about her concerns with Plaintiff's performance. Ms. Gorman also complained to Ms. Cohen about Plaintiff. (Gorman dep. 73-78, 99-101, 114-15, 119; Cohen dep. 120; Ex. 19).

53.     In the fall 2003, Mr. Schulman's loan processor became ill and Ms. Cohen hired Maureen O'Brien, who she had worked with at Manhattan Mortgage, to process loans for Mr. Schulman. (Cohen dep. 197-98; O'Brien dep. 7-9, 12, 18-19).

54.     The White Plains Office remained extremely busy through the end of 2003. (Cohen Aff. ¶32; Cohen dep. 274-75; Gorman dep. 86).

55.     Ms. Cohen signed a positive performance evaluation for Plaintiff. (Ex. 20).

56.     Plaintiff filled out her own evaluation in draft form and presented it to Ms. Cohen. (Cohen dep. 127-30, 135; Ex. 20). Ms. Cohen copied what Plaintiff had written on to her evaluation. (Id.). Plaintiff also personally completed parts of the final review herself. (Id.).

57.     At the time she completed Plaintiff's performance review, Ms. Cohen believed that Plaintiff had done a good job as the Processing Manager and positively contributed to the record number of loans closed by the White Plains Office.  (Cohen dep. 135-37).

58.     In early 2004, the loan activity in the White Plains Office started to decline.  (Cohen Aff. ¶33; Cohen dep. 274-75).  As a result, Ms. Cohen was able to focus more of her attention on the management and operations of the White Plains Office.  (Cohen Aff. ¶33; Cohen dep. 144, 274-75).

59.     On or about the evening of April 2, 2004, Ms. O'Brien called Plaintiff, her supervisor, and told her that she would no longer process loans for Mr. Schulman and was quitting.  (O'Brien dep. 41-42; Pl. dep. 131; Cohen dep. 204-05).  Plaintiff told Ms. O'Brien that she would take care of it and that Ms. O'Brien would no longer have to process loans for Mr. Schulman.  (O'Brien dep. 41-42).

60.     Ms. O'Brien stated that she would no longer process loans for Mr. Schulman because he constantly called her at home after business hours and on weekends with questions concerning his loans.  (O'Brien dep. 34, 41-42, 78).  Ms. O'Brien regularly arrived at work at 7:30 a.m. and stayed until 4:30 p.m.  Mr. Schulman did not arrive at work until the late morning or the early afternoon and routinely worked into the evenings and on weekends.  (O'Brien dep. 83-84).

61.     To ensure that Plaintiff understood that she was serious about not processing for Mr. Schulman, Ms. O'Brien told Plaintiff that she had called the police in Norwalk, Connecticut about Mr. Schulman.  (O'Brien dep. 79).  Ms. O'Brien never actually called the police and she never intended to do so.  (O'Brien dep. 79).  Ms. O'Brien was upset on the evening of April 2, 2004 because she had learned that her nephew was being deployed to Iraq.  (O'Brien dep. 79).

62.    In addition to Mr. Schulman, many of the loan officers were volatile and Ms. Gorman, Ms. Dick and other loan officers regularly raised their voices in the office.  (O'Brien dep. 40-41, 50, 90; Gorman dep. 102, 104-05; Cohen dep. 154-55; Pappas dep. 82-83).

63.    According to Plaintiff, "[t]here was a span where things got very bad with the fighting with Richard and Cheryl[,]" and "there was constant drama in the office every day."  (Pl. dep. 139).

64.    Mr. Schulman raised his voice at other employees in the office as well as banks and lenders – it "could be anybody."  (Pl. dep. 86-87).

65.    As a result of Mr. Schulman's loud and disruptive behavior in the office as well as Ms. O'Brien complaint about him calling her at home about work, MortgageIT suspended Mr. Schulman and prohibited him from coming into the White Plains Office.  (Pl. dep. 133; Cohen dep. 208, 213; Pappas dep. 118-19).

66.    Ms. O'Brien was reassigned to process loans for other loan officers in the White Plains Office.  (O'Brien dep. 42; Cohen dep. 207).

67.    As a pre-condition to returning to work at the White Plains Office, Mr. Schulman was required to seek counseling from a therapist concerning his behavior in the office and sign an agreement acknowledging, *inter alia*, that any further misconduct would result in the termination of his employment.  (Cohen dep. 213-14; Cuti Aff. ¶4, Ex. A).

68.    Mr. Schulman saw a therapist and received behavioral counseling.  (Holmes Aff. ¶10; Schulman dep. 59-60; Cohen dep. 213).

69.    By April 2004, only one loan officer (and none of the top producing loan officers) in the White Plains Office would allow Plaintiff to work on their files.  (O'Brien dep. 86-87, 89, 92-94; Cohen Aff. ¶34; Exs. 21, 22).

70.     In the spring 2004, due to the decrease in loan activity in the White Plains Office, Ms. Cohen determined that she needed to reduce the number of support staff in the office. At that time, there was one loan closer, Jolene Trifelleti. (Cohen Aff. ¶36). Because the loan processors had the time to close their own loans, there was no longer a need for a loan closer. (Id.).

71.     Ms. Cohen discussed her plan with Plaintiff and told her that Ms. Cohen wanted to tell Ms. Trifelleti that her position was being eliminated at the end of the week. (Cohen Aff. ¶37).

72.     Ms. Trifelleti shared an office with Plaintiff and assisted her with her work. (Pl. dep. 51-52; Ahern dep. 115; Cohen Aff. ¶35; Gorman dep. 117).

73.     Plaintiff disregarded Ms. Cohen's instructions and immediately told Ms. Trifelleti that her employment was going to be terminated. (Cohen Aff. ¶38; Exs. 22, 30).

74.     Ms. Cohen reprimanded Plaintiff and informed Ms. Holmes of Plaintiff's misconduct. (Cohen dep. 280-81; Cohen Aff. ¶38; Holmes Aff. ¶8).

75.     In April 2004, Ms. Cohen hired Vivian Smith to replace Ms. O'Brien and process Mr. Schulman's loans. (Cohen dep. 82, 87, 230-31).

76.     Plaintiff called Ms. Smith and told her that the White Plains Office no longer needed her services. (Cohen dep. 82, 269-71; Ex. 21, 22).

77.     Ms. Cohen reprimanded Plaintiff for her insubordination and directed her to call Ms. Smith and re-hire her. (Cohen dep. 82, 269-71, 280-81; Exs. 21, 22).

78.     Plaintiff followed Ms. Cohen's direction and Ms. Smith was hired and processed Mr. Schulman's loans. (Cohen dep. 82, 87, 230-31; Cohen Aff. ¶39).

79.     Ms. Cohen informed Ms. Holmes of Plaintiff's misconduct. (Cohen dep. 270-71; Holmes Aff. ¶8; Cohen Aff. ¶39).

80.    As a result of this second act of insubordination and breach of trust, Ms. Cohen lost confidence in Plaintiff.  (Cohen Aff. ¶39; Cohen dep. 280-81).

81.    In spring 2004, the White Plains office implemented an electronic time system in which employees recorded their time worked by logging in and out on their computers.  (Pl. dep. 44-45; Cohen Aff. ¶41).

82.    Plaintiff was charged with monitoring the time records of the support staff. (Pl. dep. 294; Cohen Aff. ¶41).  "Controlling e-time has to do with making sure that when people sign in their computers when their computers are turned on that they're signing in and out of the office on time."  (Pl. dep. 294).

83.    All MortgageIT employees were trained to log in and out of the system and Plaintiff, Shelly Arazie, and Ms. Cohen were trained to utilize the system.  (Pl. dep. 44, 294-97). The training involved "a little tutorial over the phone on how to do it."  (Pl. dep. 44).  Because the system had only been installed two months before the cessation of Plaintiff's employment, she "was not even that familiar with" it.  (Pl. dep. 297).

84.    In May 2004, Ms. Cohen noticed that Plaintiff was logging onto her computer early in the morning at times that Ms. Cohen did not think Plaintiff was in the office.  (Cohen Aff. ¶42; Cohen dep. 248-49).

85.    In late May 2004, Plaintiff took time off from work on a Thursday afternoon and on a Friday despite the fact that Ms. Cohen asked her to stay and finish some work on Thursday and take only Friday off.  Ms. Cohen did not believe Plaintiff had previously requested to have Thursday afternoon off.  (Cohen Aff. ¶46; Cohen dep. 250-51).

86.    On June 7, 2004, Ms. Cohen provided Plaintiff with a written warning concerning her unsatisfactory work performance including, *inter alia*, that she took excessive breaks

from work to run personal errands, was insubordinate in the way in which she handled the termination of Ms. Trifiletti and in the way she dealt with the hiring of Ms. Smith, and that the loan officers did not want her to process their loans and only one loan officer allowed her to process his loans. (Ex. 22; Holmes Aff. ¶21).

87.     The warning notice Plaintiff received was based solely on Plaintiff's performance deficiencies. (Ex. 22). The notice specifically indicates that Ms. Cohen, who prepared it, regarded Plaintiff as "an asset to the company" but that she wished to discuss certain issues so that "we can come to resolution and move forward building a productive profitable branch." (Ex. 22; Cohen dep. 270). The notice does not threaten any potential adverse consequences to Plaintiff's employment. (Cohen dep. 266; Ex. 22).

88.     Ms. Holmes was present at the meeting at which Ms. Cohen gave Plaintiff the written warning. (Holmes Aff. ¶21; Cohen dep. 264).

89.     On June 8, 2004, Ms. Cohen arrived at the White Plains Office early in the morning. (Cohen Aff. ¶43; Cohen dep. 248-49; Ex. 23). She observed on her computer that Plaintiff was logged into the time keeping system as being in the office at 8 a.m. (Id.). However, Plaintiff was not actually in the office. (Id.; Holmes Aff. ¶22).

90.     Ms. Cohen asked Debbie Ahern, who was Mr. Schulman's assistant and shared an office with Plaintiff, whether she had used Plaintiff's password to log her into the time system when she was not actually present in the office. Ms. Ahern admitted to Ms. Cohen that she had done so at Plaintiff's request. (Cohen dep. 248-49; Ahern dep. 97-99; Cohen Aff. ¶44).

91.     Ms. Cohen took away Plaintiff's responsibility for electronic time because she learned that Plaintiff manipulated her own electronic time records by directing Ms. Ahern to log her in when she was not actually in the office. (Ex. 23; Ahern dep. 97-99; Cohen Aff. ¶43).

-14-

92.     Ms. Cohen gave Ms. Ahern a verbal warning for engaging in misconduct at Plaintiff's direction.  (Cohen Aff. ¶45).

93.     Plaintiff was never moved out of her office that she shared with Ms. Ahern; she admits that after speaking with Ms. Holmes, "[she] did not move out of [her] office." (Pl. dep. 251).

**F.      MortgageIT Took Prompt and Effective Remedial Actions in Response to Each of Plaintiff's Complaints**

**1.      The Friday, June 13, 2003 Argument between Ms. Cohen and Mr. Schulman**

94.     In the early evening of Friday June 13, 2003, Ms. Cohen and Mr. Schulman got into a heated argument about a work-related issue in Ms. Cohen's office.  (Cohen dep. 153-54; Schulman dep. 73-74).

95.     Plaintiff was also in the White Plains office that night and overheard the argument between Ms. Cohen and Mr. Schulman.  Plaintiff took it upon herself to enter Ms. Cohen's office and verbally engage with Mr. Schulman.  (Cohen dep. 154, 159, 176; Schulman dep. 74-75).

96.     The discussion between Plaintiff and Mr. Schulman quickly became heated and they began yelling and making derogatory remarks about each other.  (Pl. dep. 84; Cohen dep. 159-60, 176; Schulman dep. 74-75).

97.     Mr. Schulman and Plaintiff left Ms. Cohen's private office and continued their verbal altercation in the common area of the White Plains Office.  (Cohen dep. 161, 176).

98.     Mr. Schulman left the White Plains Office first and went home for the evening.  (Cohen dep. 159-60).

99.     In response to the verbal altercation between Plaintiff and Mr. Schulman, MortgageIT told Mr. Schulman to work from home and required that he attend training on proper

workplace behavior. (Pappas dep. 108). Mr. Schulman attended a one-on-one training session provided by MortgageIT's outside employment law counsel. (Ex. 24).

100. Ms. Cohen supported Plaintiff in connection with her argument with Mr. Schulman because she believed that Mr. Schulman should not have yelled at Plaintiff even though she was yelling at him. (Cohen dep. 164-65). Ms. Cohen apologized to Plaintiff for Mr. Schulman's behavior and sent her an e-mail expressing her support and sympathy. (Pl. dep. 96; Ex. 25).

101. Plaintiff conceded that Mr. Schulman's behavior toward her on June 13, 2003 was not sexually or romantically motivated. (Pl. dep. 84).

102. Plaintiff went to work on the Monday morning following the Friday June 13, 2003 altercation. (Pl. dep. 95).

103. When Plaintiff arrived at her office, she found flowers from Mr. Schulman and notes on her computer apologizing for his behavior. (Pl. dep. 96).

104. After the June 13, 2003 altercation, there was a "long span" of time – approximately four to six months – in which Mr. Schulman did not speak with Plaintiff. (Pl. dep. 378).

105. Subsequently, Plaintiff and Mr. Schulman reestablished their professional and social relationship. In an April 29, 2004 e-mail, Plaintiff stated that they were "friends." (Ex. 26).

## 2. The Alleged Clothing Tag Incident – Friday, May 21, 2004

106. During the early evening of Friday May 21, 2004, Mr. Schulman tucked a clothing tag that was sticking out of the back of Plaintiff's pants back into her pants while she was sitting at her desk typing on her computer in the White Plains Office. (Pl. dep. 202; Schulman dep. 85-87; Holmes Aff., Exs. B-C; Ex. 27).

107.    There were no witnesses to the incident and Mr. Schulman and Plaintiff disagree on what exactly happened. (Schulman dep. 85-87; Pl. dep. 201; Holmes Aff. ¶18).

108.    Mr. Schulman admits that he tucked a clothing tag into Plaintiff's pants. (Schulman dep. 85-87; Holmes Aff., Exs. B-C; Ex. 27). Mr. Schulman has <u>consistently</u> maintained that: he walked up behind Plaintiff, saw a tag sticking out of her pants, and told her that the tag was sticking out; she asked him to tuck the tag in, which he did in a non-sexual manner; and he did not place his hands down her pants. (Schulman dep. 85-87; Cohen dep. 240-41, 246; Holmes Aff. ¶16, Exs. B-C; Ex. 27).

109.    Plaintiff testified that: although Mr. Schulman said beforehand that a tag was sticking out of her pants, she "didn't hear very much"; "[her] back was turned when Richard came up from behind [her]"; and she did not respond after he said that the tag was sticking out of her pants. (Pl. dep. 202). Plaintiff simply grabbed her purse, left the office, and did not tell anyone anything about the incident on the day it occurred or over the weekend. (Pl. dep. 206).

110.    Plaintiff went to work on the Monday morning following the Friday May 21, 2004 incident. (Pl. dep. 207).

111.    Plaintiff conceded that Mr. Schulman's actions on May 21, 2004 were not sexually motivated. (Pl. dep. 190).

112.    Plaintiff complained to Ms. Cohen about Mr. Schulman. (Pl. dep. 207; Cohen dep. 240-41).

113.    After Plaintiff told Ms. Cohen about what she claimed that Mr. Schulman had done, Ms. Cohen reported Plaintiff's complaint to MortgageIT's Human Resources Department. (Cohen dep. 242).

114.    Rebecca Holmes, the head of MortgageIT's Human Resources department, did not answer her phone as she was away on a business trip.  Ms. Cohen left a voice mail message for Ms. Holmes and Ms. Holmes returned her call shortly afterward. (Cohen dep. 242; Holmes Aff. ¶11).

115.    On May 26, 2004, Plaintiff reported the incident to MortgageIT's Human Resources Department.  Since Ms. Holmes was not in the office when she called, Plaintiff made her complaint about Mr. Schulman to Rossy Perez, a Human Resources representative with responsibility for benefits administration.  (Holmes Aff. ¶11).

116.    MortgageIT promptly investigated Plaintiff's complaint concerning Mr. Schulman.  (Holmes Aff. ¶¶15-18, Exs. B-C; Exs. 27-30; Cuti Aff. ¶6).

117.    MortgageIT immediately removed Mr. Schulman from the White Plains Office and prohibited him from returning to the White Plains office until the investigation was complete.  (Holmes Aff. ¶14, Exs. B-C; Exs. 27-29; Cuti Aff. ¶6).

118.    Ms. Holmes interviewed Plaintiff, Ms. Cohen and Mr. Schulman in connection with the investigation of Plaintiff's allegations.  (Holmes Aff. ¶15, Ex. B; Ex. 30).

119.    During the investigation, Plaintiff retained an attorney and filed a report with the White Plains Police Department.  (Cuti Aff. ¶8, Ex. B, p.4).

120.    Two police officers come to the White Plains Office and asked Ms. Cohen a few questions about Mr. Schulman.  Ms. Cohen, who had not witnessed the incident, answered their questions and the police left without speaking to any other employees.  (Cohen dep. 286-87).

121.    MortgageIT was unable to determine conclusively what actually happened between Mr. Schulman and Plaintiff.   They each provided different versions of the incident and there were no witnesses.  (Holmes Aff. ¶18).

122.     Because tucking a clothing tag into the pants of another employee, regardless of whether it was done at the request of the complaining party, is inappropriate work place conduct and Mr. Schulman had, at best, exercised poor judgment shortly after signing the return to work agreement in April 2004, MortgageIT terminated Mr. Schulman's employment.  (Cuti Aff. ¶¶2, 17; Holmes Aff. ¶¶18-19; Pappas dep. 156-57).

123.     The decision to terminate Mr. Schulman was made by Mr. Pappas, after consulting with Mr. Cuti and Ms. Holmes.  (Cuti Aff. ¶7; Holmes Aff. ¶20; Pappas dep. 156-57).

124.     Mr. Schulman's employment with MortgageIT was terminated on June 14, 2004.  (Ex. 31).

125.     Mr. Schulman did not work at the White Plains Office from the date he was suspended until his termination on June 14, 2004.  (Pappas dep. 93-94; Holmes Aff., Exs. B-C; Exs. 27-29, 31; Pl. dep. 229).

**G.     Plaintiff's Resignation**

126.     In mid-June 2004, MortgageIT had an opening for a Processing Manager in its office in Stamford, Connecticut.  (Cuti Aff. ¶11; Holmes Aff. ¶24; Pappas dep. 145).

127.     The position of Processing Manager in Stamford was equal to Plaintiff's position in the White Plains Office in all material respects in that it had the same title, compensation, responsibilities and opportunity for advancement.   (Cuti Aff. ¶12; Holmes Aff. ¶25; Pappas dep. 158-59).

128.     On June 16, 2004, Ms. Holmes advised Plaintiff that MortgageIT was going to transfer her to the Stamford office.  (Holmes Aff. ¶25, Ex. F; Pl. dep. 263, 271-72; Ahern dep. 94).

129.    In making the decision to transfer Plaintiff to the Stamford office, Mr. Pappas and the company were seeking a solution that would be best for the business of MortgageIT. (Pappas dep. 145; Cuti Aff. ¶10; Holmes Aff. ¶24).

130.    Mr. Pappas viewed the transfer to Stamford as an opportunity for Plaintiff to make a clean start as she would be in a new office with the same title, salary and responsibility. Mr. Pappas considered the additional commuting time from Plaintiff's home in West Harrison to Stamford and concluded that it was not an issue because it was only negligibly longer than her commute to the White Plains Offices. (Pappas dep. 145, 158-59; Cuti Aff. ¶12; Holmes Aff. ¶24).

131.    Mr. Cuti advised Plaintiff's then attorney, Marjorie Berman, that Plaintiff was being transferred to the Stamford office. (Cuti Aff. ¶13, Ex. B).

132.    Plaintiff requested a few days to think about the transfer and MortgageIT granted her request. (Cuti Aff. ¶13, Ex. B, pp. 2-3).

133.    Plaintiff advised MortgageIT through her attorney that she would not be reporting to work at the Stamford office. (Cuti Aff. ¶14, Ex. B). Plaintiff's attorney further advised that "a transfer to Stamford is not acceptable to [Plaintiff]" and that "[s]he would like to resign from the Company." (Cuti Aff., Ex. B, p.1). Plaintiff never reported to work at the Stamford office. (Pl. dep. 323; Ex. 32).

134.    MortgageIT treated her refusal to report to work as a resignation effective June 16, 2004. (Cuti Aff. ¶15, Ex. B, p.1; Holmes Aff. ¶26; Ex. 32).

135.    Plaintiff admitted that nobody at MortgageIT, including Mr. Pappas, Ms. Holmes, Mr. Cuti, Ms. Cohen or Mr. Schulman, ever told her that she was fired. (Pl. dep. 324-36).

**H.    Plaintiff's Mother's Application for a Second Mortgage**

136.    In the spring 2004, Plaintiff assisted her parents in obtaining a home equity loan on their home.  (Pl. dep. 441; Ex. 33, pp. 1-2; O'Brien dep. 81).

137.    Plaintiff was the primary contact person for the loan, which was in the name of her mother, Maribeth Pasqualini, only.  (Ex. 33, pp. 1-2; O'Brien dep. 81; Cohen dep. 299).

138.    Ms. O'Brien processed the loan for Ms. Pasqualini.  (O'Brien dep. 62, 81).

139.    The loan was initially denied.  It was only conditionally approved by Greenpoint Mortgage in May 2004 after Ms. O'Brien was able to obtain an exception on behalf of Mrs. Pasqualini from the normal underwriting guidelines.  (Ex. 33, pp. 3-4; O'Brien dep. 62; Cohen dep. 303-304).

140.    Ms. O'Brien called Greenpoint and was told that Mrs. Pasqualini's loan had been withdrawn.  (O'Brien dep. 62-63, 82; Ex. 33, p. 5).  Ms. O'Brien asked the representative from Greenpoint for the name of the person who had withdrawn the loan.  (O'Brien dep. 62-63).  Greenpoint was unable to identify the name of the person who had withdrawn the loan.  (O'Brien dep. 62-63; Ex. 33, p. 5).  Ms. O'Brien did not withdraw the loan.  (O'Brien dep. 62, 82).

141.    Ms. O'Brien is not aware of anyone at MortgageIT withdrawing Mrs. Pasqualini's loan.  (O'Brien dep. 62-63, 82).

142.    Ms. Cohen testified that she did not withdraw Mrs. Pasqualini's loan from Greenpoint, did not direct anyone to do so and is not aware of anyone having done so.  (Cohen dep. 293-94, 296).

143.    Ms. O'Brien testified that neither Plaintiff nor Mr. Pasqualini called Ms. O'Brien about the loan after it was withdrawn.  (O'Brien dep. 67).

144.   Plaintiff's parents got the second mortgage they were seeking from another broker "[a] month and half, two months" after the alleged withdrawal of the loan from Greenpoint Bank. (Pl. dep. 440).

**I.      Defendants Did Not Interfere with Plaintiff's Efforts to Find a New Job**

145.   Defendants did not interfere with Plaintiff's efforts to obtain employment with Countrywide Home Loans in Norwalk, Connecticut. (Gega dep. 16-18; Pappas dep. 167).

146.   Specifically, Mr. Joseph Gega did not request a reference from MortgageIT in connection with Plaintiff's job application. (Gega dep. 16-18).

147.   Mr. Gega did not speak to Mr. Pappas or Ms. Cohen in connection with Plaintiff's job application. (Gega dep. 17-18, 38; Pappas dep. 167).

148.   Mr. Gega does not know and has never spoken to Mr. Pappas or Ms. Cohen. (Gega dep. 17, 38).

**J.      There is No Corroboration of Plaintiff's Allegations of Sexual Harassment By Mr. Schulman in the White Plains Office**

149.   Prior to the clothing tag incident in May 2004, Plaintiff had not reported a single incident of alleged sexual harassment by Mr. Schulman to a manager or supervisor of MortgageIT. (Pl. dep. 84, 190).

150.   None of the eight individuals deposed in this case, including five former MortgageIT employees, testified that they ever witnessed Mr. Schulman sexually harass Plaintiff or any other employee of the White Plains Office. (Bach dep. 67-68; O'Brien dep. 88; Kaplan dep. 41; Ahern 105, 114; Bierfriend dep. 79).

151.   Not one witness testified that they witnessed Mr. Schulman act in a sexually inappropriate manner in the office with the sole exception of a single comment Ms. Ahern testified

that Mr. Schulman made to Plaintiff during a smoking break outside the office in a group setting.

(Bach dep. 67-68; O'Brien dep. 88; Kaplan dep. 41; Ahern dep. 66-67, 69, 114; Bierfriend dep. 79).

**K.**     **Cessation of MortgageIT's Retail Brokerage Operations – April 2008**

152.    All of MortgageIT's retail operations were closed in late November 2007.

(Holmes Aff. ¶27).

153.    The White Plains Office was closed on November 1, 2007 and all employees

were terminated.  (Holmes Aff. ¶28; Cohen dep. 32).

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000

By: _____
Felice B. Ekelman (FE 5692)
Peter C. Moskowitz (PM 8845)
Ravindra K. Shaw (RS 1944)

ATTORNEYS FOR DEFENDANTS

Dated: December 12, 2008
New York, New York