USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -

05 Civ. 9714 (LAP)

CORRINE B. PASQUALINI,                          :

                                                     **ECF CASE**

                    Plaintiff,          :

        - against -                              :              **OPINION
                                                          AND ORDER**

MORTGAGEIT, INC. d/b/a IPI SKYSCRAPER   :
MORTGAGE, MARK PAPPAS, RICHARD SCHULMAN,
CHERYL COHEN and PATRICIA GORMAN,              :

                    Defendants.     :

- - - - - - - - - - - - - - - - - - - - X

**LORETTA A. PRESKA, United States District Judge.**

**A P P E A R A N C E S :**

                              JOSEPH A. MARIA, P.C.
                              **Attorneys for Plaintiff**
                              301 Old Tarrytown Road
                              White Plains, New York  10603

FRANCES DAPICE MARINELLI, ESQ.
JOSEPH A. MARIA, ESQ.

        Of Counsel

                              JACKSON LEWIS LLP
                              **Attorneys for Defendants**
                              59 Maiden Lane
                              New York, New York  10038-4502

FELICE B. EKELMAN, ESQ.
PETER C. MOSKOWITZ, ESQ.
RAVINDRA K. SHAW, ESQ.

        Of Counsel

Plaintiff, Corrine B. Pasqualini, brings this sexual harassment and hostile work environment action against defendants MortgageIT, Inc. d/b/a IPI Skyscraper Mortgage ("MortgageIT"), Mark Pappas ("Pappas"), Richard Schulman ("Schulman"), Cheryl Cohen ("Cohen") and Patricia Gorman ("Gorman" and, together with MortgageIT, Pappas, Schulman and Cohen, "defendants"). Plaintiff's eighteen-count Second Amended Complaint alleged a litany of claims arising under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), Article 15 of the New York Human Rights Law, N.Y. Exec. Law §§ 296, *et seq.* ("NYHRL") and New York common law.  In an Opinion and Order dated July 27, 2007, we granted in part and denied in part defendants' motion to dismiss the Second Amended Complaint.  Defendants now move for summary judgment on plaintiff's remaining claims,[1] and plaintiff cross moves, requesting that we impose Rule 11 sanctions against defendants for bringing the instant motion for summary judgment.  For the reasons stated herein, defendants' motion is granted in part, and denied in part, and plaintiff's cross motion is denied.

---

[1] Plaintiff's remaining claims are: (1) creation of a hostile work environment in violation of Title VII against MortgageIT; (2) creation of a hostile work environment in violation of the NYHRL against MortgageIT, Schulman, Pappas and Cohen; (3) *quid pro quo* sexual harassment in violation of Title VII against MortgageIT; (4) *quid pro quo* sexual harassment in violation of the NYHRL against MorgageIT, Schulman, Pappas and Cohen; (5) unlawful retaliatory termination in violation of Title VII against MortgageIT; (6) intentional infliction of emotional distress against Schulman; (7) wrongful termination in violation of the NYHRL against MortgageIT, Pappas and Cohen; (8) retaliatory termination and defamation through conspiracy in violation of the NYHRL against MortgageIT, Pappas, Schulman, Cohen and Gorman; (9) intentional interference with prospective business advantage against MortgageIT, Pappas and Cohen; (10) defamation *per se* against MortgageIT, Pappas, Schulman and Cohen; (11) slander *per se* against MortgageIT, Schulman, Pappas and Cohen; (12) libel *per se* against MortgageIT; (13) battery against Schulman; and (14) assault against Schulman.

1

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

MortgageIT was a mortgage broker with its principal place of business in New York City (the "New York City Office") and a branch office in White Plains, New York (the "White Plains Office"). (Defs. R. 56.1 Stmt. ¶ 1.) Deutsche Bank purchased MortgageIT on January 1, 2007. (*Id.* ¶ 2.) Deutsche Bank closed all of MortgageIT's retail operations in late November 2007; the White Plains Office was closed on November 1, 2007, and all employees were terminated. (Holmes Aff. ¶¶ 27-28.)[2] Pappas was the head of retail sales at MortgageIT during the period of plaintiff's employment at MortgageIT. (Defs. R. 56.1 Stmt. ¶ 3.) Pappas, who was based in the New York City Office, oversaw the White Plains Office. (*Id.*) Cohen was the Branch Manager of the White Plains Office during the period of plaintiff's employment at MortgageIT. (*Id.* ¶ 4.) Schulman transferred from the New York City Office to the White Plains Office in January 2003. (*Id.* ¶ 5.) Gorman was a loan officer at the White Plains Office from April 2002 until 2004. (*Id.* ¶ 6.)

MortgageIT held itself out to be an "equal opportunity employer," and its policy and practice was "to make all employment decisions without regard to gender or any other statutorily protected status." (*Id.* ¶ 7.)[3] MortgageIT "had an Employee Handbook that contained its equal employment opportunity policies, including a sexual harassment policy, complaint procedure and prohibition

---

[2] Plaintiff notes that at least one former employee of MortgageIT worked for the company until March 2008. (Pl. Resp. R. 56.1 Stmt. ¶ 153.)

[3] Plaintiff denies this statement on the basis that another employee filed a claim of discrimination based on "creed and age . . . on or about July 2004." (Pl. Resp. R. 56.1 Stmt. ¶ 7.) However, we have reviewed the documents that defendants cite and they support defendants' statement.

against retaliation." (Defs. R. 56.1 Stmt. ¶ 8.)[4]  Plaintiff and defendants dispute the extent to which

MortgageIT's Employee Handbook and policies were available to employees, as well as the

existence of complaint procedures at the time of the facts underlying this case.  (*Compare* Defs. R.

56.1 Stmt. ¶¶ 9-11 *with* Pl. Resp. R. 56.1 Stmt. ¶¶ 9-11.)  Plaintiff received a copy of MortgageIT's

sexual harassment policy at the outset of her employment and signed an acknowledgment that she

had read and agreed to abide by the policy and procedures relating thereto.  (Defs. R. 56.1 Stmt. ¶

12.)[5]  In the summer and fall of 2003, MortgageIT provided equal employment opportunity training,

which specifically included sexual harassment prevention training, at certain branch offices.  (Defs.

R. 56.1 Stmt. ¶ 13.)  Employees in the White Plains Office received this training on September 17,

2003  (*id.* ¶ 14), though plaintiff notes that the training occurred only once and was not "held with

[] attorneys."  (Pl. Resp. R. 56.1 Stmt. ¶ 13.)  Plaintiff and Schulman "signed acknolwedgments that

they understood and agreed to abide by the terms of MortgageIT's [equal employment opportunity],

sexual harassment, and other policies" (Defs. R. 56.1 Stmt. ¶ 14); plaintiff notes that Schulman

signed the acknowledgment in July 2003.  (Pl. Resp. R. 56.1 Stmt.  ¶ 14.)

Plaintiff was approved by Cohen to be hired as a loan processor, an at-will employment

position, at the White Plains Office in April 2002.  (Defs. R. 56.1 Stmt. ¶¶ 16-18.)  Prior to working

---

[4]  Plaintiff appears to deny this, stating that no sexual harassment training was given when the White Plains Office opened and that "the branch manager did not see the need for an attorney to come to the office to provide sexual harassment training to the employees."  (Pl. Resp. R. 56.1 Stmt. ¶ 8.)  None of these allegations, however, disputes defendants' statement that MortgageIT had an Employee Handbook.

[5]  Plaintiff appears to deny this, stating that she "was provided the company's policy after she complained to Cheryl Cohen, her supervisor, of sexual harassment by Richard Schulman." (Pl. Resp. R. 56.1 Stmt. ¶ 12.)  However, we have reviewed the document cited by defendants, and it supports defendants' statement.

at MortgageIT, plaintiff worked with Cohen as a loan processor at Manhattan Mortgage Company ("Manhattan Mortgage"). (*Id.* ¶ 19.) During plaintiff's employment with MortgageIT, Cohen was always plaintiff's immediate supervisor. (*Id.* ¶ 21.)

Cohen, the branch manager of the White Plains Office, reported to Pappas. (*Id.* ¶ 22.)[6] The business of the White Plains Office was to "originate and close residential loans." (Defs. R. 56.1 Stmt. ¶ 23.) Loan officers were responsible for originating loans, which meant "identifying a home purchaser or homeowner seeking a mortgage or home equity loan and matching them [sic] with a lender for their [sic] loan." (*Id.* ¶ 24.) Loan officers reported directly to Cohen. (*Id.* ¶ 25.) Loan processors assisted loan officers in completing, submitting and closing the loans originated by the loan officers. (*Id.* ¶ 27.) In addition, "top producing loan officers" were provided with administrative assistants. (*Id.* ¶ 29.) Plaintiff notes that "Schulman was the only loan officer at . . . MortgageIT who had his own assistant." (Pl. Resp. R. 56.1 Stmt. ¶ 29.) A processing manager, also known as an operations manager, supervised support staff, managed the workflow of loan processors, assisted loan processors with any questions or issues in the processing of loans and processed loans for loan officers. (Defs. R. 56.1 Stmt. ¶¶ 30-31.) Defendants characterize the business of brokering residential mortgages as "extremely competitive, time sensitive and stressful;" they note that "[l]oan officers are compensated on the basis of the commissions they earn from closing loans and they only get paid on loans that close" and that "[h]ome purchasers are almost always under pressure to close their loans and[, like homeowners,] expect that their mortgages will

---

[6] Plaintiff denies this and states that while Pappas was Cohen's immediate supervisor, Cohen failed to report complaints to him. (Pl. Resp. R. 56.1 Stmt. ¶ 22.)

proceed quickly and without any problems." (*Id.* ¶¶ 33-36.)[7]

Plaintiff processed loans for Mira Dick, "one of the top producing loan officers at MortgageIT." (Defs. R. 56.1 Stmt. ¶ 37.) Dick became dissatisfied with plaintiff's job performance and requested that plaintiff "no longer process her loans." (*Id.* ¶ 38.)[8] In 2002, other loan officers at the White Plains Office, including Jeff Deldetto, Debbie Schacter, Marilyn Rowley, Bill Christiano, Peter Gabel and Andy Caminsky complained to Cohen that plaintiff "was not properly or timely processing their loans." (Defs. R. 56.1 Stmt. ¶ 39.)[9]

The period from mid -2002 through the end of 2003 was "one of the busiest in the history of the mortgage business as homeowners refinanced their mortgages at an unprecedented rate." (Defs. R. 56.1 Stmt. ¶ 40.)[10] As a result, the number of loans handled in the White Plains Office "exploded," and the office operated beyond capacity. (Defs. R. 56.1 Stmt. ¶ 41.) Cohen approved for hire additional loan officers and support staff to process and close the loans being handled by the White Plains Office, but it was difficult to find qualified personnel. (*Id.* ¶ 42.) Further, to manage

---

[7] Plaintiff disputes this on the basis that the testimony cited was provided by individuals who were not loan officers or home purchasers. (Pl. Resp. R. 56.1 Stmt. ¶¶ 33-36.) The Court fails to see how these facts render the testimony improper.

[8] Plaintiff denies this statement on the basis that Dick is "one of . . . Cohen's best friends." (Pl. Resp. R. 56.1 Stmt. ¶ 38.) The Court fails to see how Dick's friendship with Cohen bears upon Dick's dissatisfaction with plaintiff's work.

[9] Plaintiff denies this, (Pl. Resp. R. 56.1 Stmt. ¶ 39), however, offers no citation to support this denial. The Court has reviewed the testimony cited by defendants and it supports their statement.

[10] Plaintiff denies this, stating that Cohen said "'the industry was so crazy . . . ;'" that Cohen had no training regarding a sexual harassment policy and that "[i]t was a chaotic time." (Pl. Resp. R. 56.1 Stmt. ¶ 40.) The Court fails to see how plaintiff's statements refute defendants' statement.

5

the increase in the number of loans, Cohen approved for hire a processing manager to supervise the work flow and increased support staff.  (*Id.* ¶ 43.)[11]  Cohen promoted plaintiff to the position of processing manager in February 2003, which made plaintiff "'second in charge' in the White Plains [O]ffice."  (Defs. R. 56.1 Stmt. ¶ 44.)

Cohen stated that in 2003, nearly all of the loan officers at the White Plains Office complained that plaintiff lacked the knowledge to help them, that she did not efficiently process loans and that she was often out of the office and unavailable during business hours.  (*Id.* ¶ 48.)[12] Plaintiff and defendants disagree as to whether Cohen spoke to plaintiff about the complaints allegedly lodged against her.  (*Compare* Defs. R. 56.1 Stmt. ¶¶ 49-50 *with* Pl. Resp. R. 56.1 Stmt. ¶¶ 49-50.)  In June 2003, Gorman became dissatisfied with plaintiff's job performance and expressed concerns to Cohen about plaintiff.  (Defs. R. 56.1 Stmt. ¶¶ 51-52.)  However, plaintiff states that Gorman only complained about her job performance because Gorman was upset "because of [plaintiff's] complaint against [] Schulman."  (Pl. Resp. R. 56.1 Stmt. ¶ 52.)[13]  In the fall of 2003, Schulman's loan processor fell ill, and Cohen hired Maureen O'Brien ("O'Brien"), with whom Cohen had worked at Manhattan Mortgage, to process loans for Schulman.  (Defs. R. 56.1 Stmt. ¶ 53.)

---

[11]  Plaintiff denies this but does not offer any citation to the record to support this denial. (Pl. Resp. R. 56.1 Stmt. ¶ 43.)

[12]  Plaintiff denies this on the basis that she "was never given any warning" until "after her complaints of sexual harassment."  (Pl. Resp. R. 56.1 Stmt. ¶ 48.)  The Court has reviewed the citation provided by defendants and finds that it supports their statement.  Further, plaintiff's statement does not contradict that of defendants.

[13]  As described more fully herein, plaintiff made complaints to various individuals at MortgageIT regarding Schulman's behavior towards her.

In February 2004, Cohen endorsed a positive evaluation of plaintiff's performance. (Pl. Resp. R. 56.1 Stmt. ¶ 55.) Cohen testified that, at the time she endorsed the performance evaluation, she believed that plaintiff had done a good job as the processing manager and that plaintiff had positively contributed to the record number of loans closed by the White Plains Office. (Defs. R. 56.1 Stmt. ¶ 57.)

In early 2004, "loan activity in the White Plains Office started to decline," and Cohen began "to focus more of her attention on the management and operations of the White Plains Office." (*Id.* ¶ 58.) On April 2, 2004, O'Brien told plaintiff that she was quitting her job at MorgageIT because Schulman, for whom she processed loans, "constantly called her at home after business hours and on weekends with questions concerning his loans." (*Id.* ¶¶ 59-60.) O'Brien told plaintiff that she had called the police to report Schulman; however, O'Brien never in fact called the police and never intended to do so. (*Id.* ¶ 61.)

As a result of Schulman's "loud and disruptive behavior," MortgageIT suspended Schulman. (*Id.* ¶ 65.) O'Brien was reassigned to process loans for other loan officers in the White Plains Office. (*Id.* ¶ 66.) As a precondition to Schulman's return to work at the White Plains Office, Schulman was required to seek counseling from a therapist concerning his office behavior and to sign an acknowledgment that further misconduct would result in termination of his employment. (*Id.* ¶ 67.)

During the spring of 2004, Cohen reduced the number of support staff in the White Plains Office. (*Id.* ¶ 70.) Accordingly, she decided to terminate Jolene Trifelleti's ("Trifelleti") employment. (*Id.* ¶ 71.)[14] Plaintiff and defendants dispute the circumstances surrounding Trifelleti's

---

[14] Plaintiff notes that Trifelleti later sued MortgageIT and Cohen for discrimination based on "age, creed and retaliation/opposing discrimination." (Pl. Resp. R. 56.1 Stmt. ¶ 70.)

termination.  Defendants state that Cohen told plaintiff that she planned to fire Trifelleti, that plaintiff forewarned Trifelleti and that Cohen then reprimanded plaintiff for having done so.  (Defs. R. 56.1 Stmt. ¶¶ 71, 73-74.)  Plaintiff contends that Cohen instructed her to terminate Trifelleti, that the termination was occasioned by Trifelleti's refusal to process loans for Schulman and that Cohen never reprimanded plaintiff for firing Trifelleti.  (Pl. Resp. R. 56.1 Stmt. ¶¶ 71, 74.)

Plaintiff and defendants also disagree regarding the circumstances surrounding the hiring of Vivian Smith ("Smith").  Defendants aver that Cohen hired Smith to replace O'Brien and process Schulman's loans and that plaintiff then improperly called Smith to inform her that the White Plains Office did not need her services.  (Defs. R. 56.1 Stmt. ¶¶ 75-76.)  Defendants aver that Cohen reprimanded plaintiff for insubordination, reported plaintiff's misconduct to Rebecca Holmes ("Holmes")[15] and instructed plaintiff to call Smith and re-hire her, which plaintiff did, and Smith was assigned to process Schulman's loans.  (*Id.* ¶¶ 77-79.)  Cohen stated that, as a result of this "insubordination and breach of trust," she lost confidence in plaintiff.  (*Id.* ¶ 80.)  Plaintiff disagrees with this, noting that she continued in her position as processing manager and suggests that Cohen was "angry because [p]laintiff complained about her friend and top producer, [] Schulman."  (Pl. Resp. R. 56.1 Stmt. ¶ 80.)

Plaintiff avers that Cohen directed plaintiff to work as Schulman's loan processor, which plaintiff refused to do, and that plaintiff hired Smith through an employment agency as a contract underwriter for the White Plains Office.  (*Id.* ¶ 75.)  Plaintiff avers that she was initially instructed not to hire Smith because the agency fee was too high, that she was never reprimanded and that she

---

[15] Homes was the head of MortgageIT's human resources department from October 2000 until 2006.  (Holmes Aff. ¶ 2.)

later hired Smith after the agency fee was approved. (*Id.* ¶¶ 76-78.) Plaintiff also states that Holmes was never called, though plaintiff does not offer a citation to the record to support this, and plaintiff states that she did not receive any complaints from defendants until after she complained about Schulman. (*Id.* ¶ 79.)

In the spring of 2004, the White Plains Office implemented an electronic time system, through which employees recorded their time by "logging in and out on their computers." (Defs. R. 56.1 Stmt. ¶ 81.) Plaintiff was charged with monitoring the time records of the support staff. (*Id.* ¶ 82.) All MortgageIT employees were trained to "log in and out of the system," and plaintiff, Shelly Arazie and Cohen were trained to "utilize the system," which training involved "'a little tutorial over the phone.'" (*Id.* ¶ 83.) Plaintiff stated that she "'was not [] that familiar with' [the system]." (*Id.*) In May 2004, Cohen "noticed that [p]laintiff was logging into her computer early in the morning at times that [] Cohen did not think [p]laintiff was in the office." (*Id.* ¶ 84.)[16]

In late May of 2004, plaintiff "took time off from work on a Thursday afternoon and on a Friday despite the fact that [] Cohen asked her to stay and finish some work on Thursday and take only Friday off." (Defs. R. 56.1 Stmt. ¶ 85.) Cohen did not believe that plaintiff had previously requested to take Thursday afternoon off. (*Id.*) Plaintiff avers that she gave advance notice of a medical procedure and that Cohen "intentionally gave [p]laintiff a hard time without basis . . . because of [p]laintiff's complaint about her good friend, [] Schulman." (Pl. Resp. R. 56.1 Stmt. ¶ 85.)

---

[16] Plaintiff disputes this, stating that she never logged into the system when she was not present in the office, however, plaintiff does not offer a citation to the record to support this statement. (Pl. Resp. R. 56.1 Stmt. ¶ 84.) Further, even assuming plaintiff's statement is true, it does not conflict with Cohen's statement that she "did not think" that plaintiff was in the office. (Defs. R. 56.1 Stmt. ¶ 84.)

On June 7, 2004, during a meeting with Holmes and Cohen, Cohen provided plaintiff with a "written warning concerning her unsatisfactory work performance including, *inter alia*, that she took excessive breaks from work to run personal errands, was insubordinate in the way in which she handled the termination of [] Trifiletti and in the way she dealt with the hiring of [] Smith, and that the loan officers did not want her to process their loans" (the "June 7 Warning"). (Defs. R. 56.1 Stmt. ¶¶ 86, 88.) Plaintiff notes that the June 7 Warning was not provided to her until after she complained about Schulman. (Pl. Resp. R. 56.1 Stmt. ¶ 86.) While defendants characterize the June 7 Warning as "based solely on [p]laintiff's performance deficiencies," (Defs. R. 56.1 Stmt. ¶ 87), plaintiff avers that the warning "constitute[d] retaliation" for a complaint that she had made against Schulman less than one week earlier. (Pl. Resp. R. 56.1 Stmt. ¶ 87; Pl. R. 56.1 Stmt. ¶ 67.)

On June 8, 2004, Cohen stated that she arrived at the White Plains Office and "observed on her computer that [p]laintiff was logged into the time keeping system as being in the office at 8 a.m." (Defs. R. 56.1 Stmt. ¶ 89.) However, Cohen stated that plaintiff was not actually in the office at that time. (*Id*.) Cohen asked Debbie Ahern ("Ahern"), who shared an office with plaintiff and who was Schulman's assistant, whether Ahern had used plaintiff's password to log her into the time system when plaintiff was not present in the office. (*Id*. ¶ 90.) Ahern stated that she had done so at plaintiff's request. (*Id*.)[17] Cohen then took away plaintiff's responsibility for electronic time. (Defs. R. 56.1 Stmt. ¶ 91.) Cohen gave Ahern a "verbal warning" for engaging in misconduct at the

---

[17] Plaintiff states that she never provided Ahern with her password, however, plaintiff does not offer any citation to the record to support this. (Pl. Resp. R. 56.1 Stmt. ¶ 90.) Plaintiff also states that defendants' version is unsupported by the record, however, the Court has reviewed defendants' citations and finds that the version is corroborated by the testimony cited.

direction of plaintiff.  (*Id.* ¶ 92.)[18]

## I.    Plaintiff's Allegations Against Schulman

### A.    June 13, 2003 Incident

In the early evening of Friday, June 13, 2003, Cohen and Schulman became engaged in a heated argument in Cohen's office.  (Defs. R. 56.1 Stmt. ¶ 94.)  Plaintiff avers that she saw Schulman light a file on fire, which he threw at Cohen, and that plaintiff entered Cohen's office when she heard Cohen screaming. (Pl. Resp. R. 56.1 Stmt. ¶¶ 94-95.)  Plaintiff and Schulman then became engaged in a heated argument and began making derogatory remarks about each other. (Defs. R. 56.1 Stmt. ¶ 96.)  Plaintiff alleges that Schulman "threw [her] up against a sectional and pressed his body against [her] with his hands up against her chest." (Pl. Resp. R. 56.1 Stmt. ¶ 96.)[19] Plaintiff characterizes Schulman's behavior as "menacing and sexual." (Pl. Resp. R. 56.1 Stmt. ¶ 96.)[20]  Defendants deny that Schulman touched plaintiff.  (Defs. Resp. R. 56.1 Stmt. ¶ 11.)

In response to the altercation between plaintiff and Schulman, MortgageIT investigated

_____

[18]  Plaintiff denies this but states only that "Ahern still works for [] Schulman."  (Pl. Resp. R. 56.1 Stmt. ¶ 92.)  The Court fails to see how Ahern's employment status is relevant to whether Cohen verbally reprimanded her.

[19]  Plaintiff states that she "filed a complaint with the White Plains Police Department" regarding this incident (Pl. R. 56.1 Stmt. ¶ 20), however, the portion of the record that plaintiff cites, "Ex. '28'", is an email from Cohen and entirely unrelated to the June 13, 2003 incident or any police report.

[20]  Defendants state that plaintiff "conceded that [] Schulman's behavior torward her on June 13, 2003 was not sexually or romantically motivated."  (Defs. R. 56.1 Stmt. ¶ 101.)  The Court has reviewed plaintiff's deposition, and defendants' representation is inaccurate.  Plaintiff stated that "[t]here would be absolutely nothing romantic about [] Schulman" but elaborated that "[o]n his end" the incident was sexual.  (Pl. Dep. at 84.)

Schulman; Schulman was asked to leave work until completion of the investigation, after which he returned to work.  (Pappas Dep. at 108.)  An internal document from MortgageIT states that Schulman was "to undergo private professionalism training.  Situation monitored by [] Pappas. Entire office to receive training as well. [Cohen] told to notify HR IMMEDIATELY if any future outbursts." (Moskowitz Aff., Ex. 24 (emphasis in original).)  The record does not indicate whether Schulman underwent any such training.

Plaintiff went to work on the Monday morning following the June 13, 2003 altercation and, when she arrived, she found flowers from Schulman and "notes on her computer apologizing for his behavior." (Defs. R. 56.1 Stmt. ¶¶ 102-03.)

### B.     The Clothing Tag Incident

In the early evening of Friday, May 21, 2004, Schulman tucked in a clothing tag that was sticking out of the back of plaintiff's pants while plaintiff was sitting at her desk (the "Clothing Tag Incident").  (*Id.* ¶ 106.)  Plaintiff states that, in the course of tucking in the clothing tag, Shulman "thrust his hand down the back of her underwear, grabbing and squeezing her bare buttocks." (Pl. R. 56.1 Stmt. ¶ 28.)  Defendants deny that Schulman placed his hands "down [plaintiff's] pants." (Defs. Resp. R. 56.1 Stmt. ¶ 28.)  Schulman also stated that he first told plaintiff that a tag was sticking out and that she then asked him to tuck the tag in.  (Defs. R. 56.1 Stmt. ¶ 108.)  Plaintiff's back was turned at the time Schulman came up behind her, and she "'didn't hear very much.'" (*Id.* ¶ 109.)  Nobody except Schulman and plaintiff witnessed the Clothing Tag Incident, and Schulman and plaintiff "disagree on what exactly happened." (*Id.* ¶ 107.)

Plaintiff went to work on the Monday following the Clothing Tag Incident and complained

to Cohen about Schulman. (*Id.* ¶¶ 110, 112.) Cohen testified that she immediately reported the incident and left a message for Holmes. (*Id.* ¶¶ 113-14.)[21] On Friday, May 26, 2004, plaintiff reported the Clothing Tag Incident to MortgageIT's human resources department. (Defs. R. 56.1 Stmt. ¶ 115.) MortgageIT investigated plaintiff's complaint, during which investigation Schulman was not permitted to return to the White Plains Office. (*Id.* ¶¶ 116-17.)[22] During the investigation, Holmes interviewed Cohen and Schulman. (Pl. Resp. R. 56.1 Stmt. ¶ 118.) Plaintiff filed a report with the White Plains Police Department and later hired an attorney. (*Id.* ¶ 119.) Two police officers went to the White Plains Office and asked Cohen several questions. (Defs. R. 56.1 Stmt. ¶ 120.)

Defendants aver that "[b]ecause tucking a clothing tag into the pants of another employee, regardless of whether it was done at the request of the complaining party, is inappropriate work place conduct," Pappas, after consulting with MortgageIT's attorney John Cuti and Holmes, terminated Schulman's employment, effective June 14, 2004. (*Id.* ¶¶ 122-24.) Plaintiff disputes this and states that Schulman was never terminated but rather worked from home. (Pl. Resp. R. 56.1 Stmt. ¶ 122-23.) Later in 2004, Schulman was rehired because defendants "didn't have proof of what happened, the incident of what happened at the time." (Pappas Dep. at 167.)


C.      **Other Allegations Against Schulman**

---

[21] Plaintiff denies this, claiming that it is "[u]nsupported by any evidence in the record," (Pl. Resp. R. 56.1 Stmt. ¶ 113), however, the statement is supported by the deposition testimony that defendants cite.

[22] Plaintiff states that Schulman was permitted to work from home during this time, (Pl. Resp. R. 56.1 Stmt. ¶ 117), however, she does not cite the record in support of this statement.

Plaintiff alleges that "Schulman offered to buy [p]laintiff a pair of Manola [sic] Blahnik [shoes] if she would f_ck him . . . [and, on another occasion,] Schulman asked [p]laintiff if she used a 'vibrator.'"  (Pl. R. 56.1 Stmt. ¶ 22; *see* Pl. Dep. at 116-17, 119-20.)[23]

## II.   Plaintiff's Employment with MortgageIT Ends

Following the conclusion of the investigation of the allegations against Schulman, Pappas decided to transfer plaintiff to the Stamford, Connecticut office (the "Stamford Office"), where there was an opening for a processing manager. (Defs. R. 56.1 Stmt. ¶ 126; Cuti Aff. ¶ 11.)[24] Defendants believed that the transfer "would benefit the company by giving both [p]laintiff and the White Plains [O]ffice a fresh start." (Cuti Aff. ¶ 11.) Defendants aver that the position in the Stamford Office was "equal to [p]laintiff's position in the White Plains Office in all material respects in that it had the same title, compensation, responsibilities and opportunity for advancement." (Defs. R. 56.1 Stmt. ¶ 127.)[25] On June 16, 2004, Holmes advised plaintiff that MortgageIT was going to transfer

---

[23] Manolo "Blahnik's stiletto shoes are regularly featured in fashion magazines and they have been recognized as 'footwear icons.'" Elizabeth F. Johnson, Note, *Defining Fashion: Interpreting the Scope of the Design Piracy Prohibition Act*, 73 Brook. L. Rev. 729, 762 n.191 (2008).

Plaintiff also states that Schulman "treated her as if she were a prostitute" (pl. Resp. R. 56.1 Stmt. ¶ 22), however, plaintiff does not offer a citation to the record for that comment, and this Court's review of plaintiff's 489-page deposition has not yielded a reference to such treatment.

[24] Plaintiff denies that there was an opening for a processing manager in the Stamford Office, however, she does not elaborate on her denial and does not offer any citation to the record. (Pl. Resp. R. 56.1 Stmt. ¶ 126.)

[25] Plaintiff disputes this and states that her compensation would be lower in the Stamford Office because compensation was based on commission and the Stamford Office has a lower volume of business, however, plaintiff's cites only her affidavit, which does not speak to compensation. (Pl. Resp. R. 56.1 Stmt. ¶ 127.)

14

her to the Stamford Office.  (Defs. R. 56.1 Stmt. ¶ 128.)

Plaintiff advised MortgageIT, through her attorney, that "a transfer to Stamford is not acceptable," that she "would like to resign from [MortgageIT]" and that "she will not be reporting to Stamford." (Cuti Aff., Ex. B.)  Plaintiff avers that she did not resign, but was fired.  (Pl. Resp. R. 56.1 Stmt. ¶ 133.)

### III.   Plaintiff's Mother's Application for a Mortgage

In the spring of 2004, plaintiff referred her mother ("Ms. Pasqualini"), who was seeking a home equity loan, to MortgageIT.  (*Id.* ¶ 136.)  O'Brien processed the loan for Ms. Pasqualini. (Defs. R. 56.1 Stmt. ¶ 138.)  Ms. Pasqualini's loan was approved by Greenpoint Mortgage in May 2004.  (*Id.* ¶ 139.)  At some point following Greenpoint Mortgage's approval of Ms. Pasqualini's loan and before closing, Ms. Pasqualini's loan was withdrawn.  (Pl. Resp. R. 56.1 Stmt. ¶ 140.) Plaintiff avers that the mortgage "was withdrawn by someone from MortgageIT [] after [] plaintiff had already been fired." (*Id.*)  Defendants aver that O'Brien was informed by Greenpoint that "[Ms.] Pasqualini's loan had been withdrawn" and that O'Brien was "not aware of anyone at MortgageIT withdrawing [Ms.] Pasqualini's loan." (Defs. R. 56.1 Stmt. ¶¶ 140-41.)  Cohen also testified that she did not withdraw Ms. Pasqualini's loan, that she did not direct anyone to do so and that she was not aware of anyone else doing so.  (*Id.* ¶ 142.)

### IV.   Plaintiff's Job Application with Countrywide Home Loans

In July 2006, Danielle Claroni ("Claroni"), a real estate agent in Greenwich, Connecticut, "set up an interview between [plaintiff] and [] Joseph Gega" for a position at Countrywide Home Loans

("Countrywide"). (Claroni Aff. ¶¶ 1-2.) Claroni states that, following the interview, Gega told her that while he was impressed with plaintiff, "he could not [hire her] after checking her references" based on the "terrible things" that Cohen said about Pasqualini, including an allegation that plaintiff "makes baseless allegations about her coworkers." (*Id.* ¶¶ 3-5.) Gega denies speaking to any individual at MortgageIT regarding plaintiff and states that he never conducted a reference check with respect to plaintiff. (Gega Dep. at 16-18.)

## DISCUSSION

### I.     <u>Legal Standard</u>

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, as one court explained:

16

> [S]ummary judgment must be granted against a party in instances
> when such party fails to adequately establish an essential element on
> which it bears the burden of proof. . . .  The non-moving party may
> not rest upon unsubstantiated allegations, conclusory assertions or
> mere denials of the adverse party's pleading, but must set forth and
> establish specific facts showing that there is a genuine issue for trial.
> . . .  A metaphysical or other whimsical doubt concerning a material
> fact does not establish a genuine issue necessitating a trial. . . .  The
> mere existence of a scintilla of evidence supporting the non-movant's
> case is insufficient to defeat a motion for summary judgment.

*Brooks v. Di Fasi*, 1997 U.S. Dist. LEXIS 11162, at *6-7 (W.D.N.Y. July 30, 1997) (internal

quotation marks and citations omitted).

## II.     Hostile Work Environment Under Title VII and the NYHRL

To prevail on a hostile work environment claim predicated on sexual harassment under Title

VII, a plaintiff must prove that: (1) "the harassment was 'sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment'" and (2) "a

specific basis exists for imputing the conduct that created the hostile work environment to the

employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997); *see also Wahlstrom v.

Metro-N. Commuter R.R. Co.*, 89 F. Supp. 2d 506, 526 (S.D.N.Y. 2000) (noting that "'[i]t has been

established in federal and state courts in New York that the standards of proof for claims brought

under the [NYSHRL] are governed by the same standards as a claim under Title VII'") (alterations

in original).

### A.     Severity or Pervasiveness of the Harassment Under Title VII and the NYHRL

For a working environment to be actionable under Title VII, it "must be both objectively and

subjectively offensive, one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining whether a work environment is so "hostile or abusive to violate Title VII, we look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (internal quotation marks, alterations and citation omitted). The question of the degree of severity or pervasive hostility is generally a question of fact, and summary judgment should be granted only where no reasonable juror could conclude that defendant's conduct intolerably altered plaintiff's work conditions. *Id.* ("'An Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts . . . presents an issue for the jury.'")

If a jury believes plaintiff's allegations that Schulman threw her against a sectional, pressed his body against her body and pressed his hand against her chest and that, on a different occasion, Schulman thrust his hand into her underwear and grabbed her buttocks, that jury could find that Schulman crossed the "admittedly indistinct line between 'boorish and inappropriate' behavior and actionable sexual harassment." *Casolare v. County of Onondaga*, 2006 WL 1877139, at *7 (N.D.N.Y. July 6, 2006). The Second Circuit has commented that, among virtually infinite kinds of circumstances, a certain line can be drawn and "[o]n one side lie sexual assaults; physical contact; uninvited sexual solicitations . . . [and] [o]n the other side lies the occasional vulgar banter tinged with sexual innuendo, of coarse or boorish workers." *See Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998) *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (internal quotation marks and alterations omitted). If a jury believes plaintiff's version of events,

it may find that Schulman's conduct falls on the actionable side of the line drawn in *Gallagher*.

Defendants argue that all of the incidents underlying plaintiff's harassment claim were isolated and

that "[i]solated acts rarely meet the threshold of severity or pervasiveness." (Defs. Mem. Supp.

Summ. J. at 7.) This is true; however, isolated incidents that are "extremely serious" may meet that

threshold. *Faragher*, 524 U.S. at 788. The cases that defendants cite in their brief do not hold

otherwise, as none offers factual scenarios with physical assaults as serious as those alleged by

plaintiff in this case. (Defs. Mem. Supp. Summ. J. at 6-10.)

A reasonable jury may find that the alleged incidents of unwelcome physical intrusion upon

plaintiff's body are so "extremely serious" as to meet the threshold for actionability under Title VII,

thereby creating an objectively and subjectively unreasonable work environment that unreasonably

interfered with plaintiff's work performance. Because determination of whether Schulman's conduct

created a work environment that is actionable under Title VII requires resolution of a question of

fact, we cannot resolve this as a matter of law.

### B.    Employer Liability Under Title VII

Where, as here, a jury may find a work environment to be abusive, a plaintiff must next

establish a basis for imputing liability to the employer. In determining whether to impute liability,

the threshold question is whether the individual responsible for the harassment was plaintiff's

supervisor. Where the harasser is plaintiff's supervisor, the employer will be held liable. *Faragher*,

524 U.S. at 777 ("An employer is subject to vicarious liability to a victimized employee for an

actionable hostile work environment created by a supervisor with immediate (or successively higher)

authority over the employee."). "However, when the harassment is attributable to a co-worker, rather

than a supervisor, . . . the employer will be held liable only for its own negligence." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998).  Plaintiffs repeatedly refer to Schulman as MortgageIT's "top producer" (*see, e.g.*, Pl. Mem. Opp. Summ. J. at 18), however, nothing in the record indicates that Schulman had "immediate (or successively higher) authority over" plaintiff. *Faragher*, 524 U.S. at 777.  Because Schulman was plaintiff's co-worker and not her supervisor, MortgageIT can only be liable for its own negligence.

In a case of harassment attributable to a co-worker, liability attaches to the employer only where "the employer has either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (internal quotation marks and citation omitted).  As it appears undisputed from the record that MortgageIT knew of Schulman's allegedly harassing behavior toward plaintiff, we turn now to whether MortgageIT met its duty to take reasonable steps to remedy that harassment. *Distasio*, 157 F.3d at 65.  Whether MortgageIT's response was reasonable requires consideration of the totality of the circumstances, including "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Id.*

Defendants aver that MortgageIT took reasonable steps to prevent and correct harassment because, after plaintiff reported the Clothing Tag Incident, "MortgageIT promptly investigated [p]laintiff's complaint, immediately removed [] Schulman from the White Plains [O]ffice, and prohibited him from returning to work until the investigation was complete." (Defs. Mem. Supp. Summ. J. at 13.)  These facts are undisputed and we, therefore, accept them as true.  However, the undisputed facts also show that, almost immediately following plaintiff's complaint, she was

20

involuntarily transferred to the Stamford Office and, thereafter, Schulman was rehired because defendants "didn't have proof of what happened, the incident of what happened at the time." (Pappas Dep. at 167.)  Whether MortgageIT's actions in transferring the victim and subsequently rehiring the harasser were reasonable as a means to prevent or remedy the harassment is not a question with so clear an answer that we can resolve it as a matter of law.  Therefore, defendants' motion for summary judgment as to plaintiff's claim of a hostile work environment under Title VII is denied.

### C.      Employer Liability Under the NYHRL

Under the NYHRL, "an employer cannot be held liable for an employee's discriminatory act unless the employer [becomes] a party to it by encouraging, condoning, or approving it." *Wahlstrom*, 89 F. Supp. 2d at 526 (internal quotation marks and citation omitted).  An employer "can disprove [] condonation by a showing that the employer reasonably investigated a complaint of discriminatory conduct and took corrective action." *Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414, 433 (S.D.N.Y. 1998) (internal quotation marks and citation omitted).  There is no evidence that MortgageIT encouraged Schulman's harassment of plaintiff; however, given MortgageIT's questionable response to plaintiff's complaint of harassment, a jury could find that MortgageIT condoned or approved of the behavior.  Defendants have not disproved condonation by showing that MortgageIT took corrective action because, as described above, the sufficiency of the corrective action is a question of fact.  Therefore, defendants' motion for summary judgment as to plaintiff's claim of a hostile work environment in violation of the NYHRL is denied.

### D.    Individual Liability of Schulman, Pappas and Cohen Under the NYHRL

Section 296 of the NYHRL "states that it shall be an unlawful discriminatory practice for any

person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article."

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (internal quotation marks and citation

omitted).  This provision creates "individual liability for any person who 'actually participates in the

conduct giving rise to a [harassment] claim.'" *Henry v. Wyeth Pharm., Inc.*, 2007 WL 4526525, at

*7 (S.D.N.Y. Dec. 19, 2007) (Conner, J.) (internal citation omitted), *see also Banks v. Corr. Servs.*

*Corp.*, 475 F. Supp. 2d 189, 200-01 (E.D.N.Y. 2007).  Plaintiff offers no explanation, and the record

does not reflect, how Pappas or Cohen may have aided, abetted, incited, compelled or coerced any

of the harassment at issue in this case.  Because plaintiff has not offered any evidence on these

claims, she cannot withstand the instant motion for summary judgment with respect to the claims

against Pappas and Cohen.  Defendants have not moved for summary judgment on this claim with

respect to Schulman, who was the individual who actually participated in the allegedly harassing

conduct.  Plaintiff's claims that Pappas and Cohen created a hostile work environment in violation

of the NYHRL are dismissed.


### III.    Retaliation Under Title VII

Title VII prohibits retaliation against an employee "because [such employee] has opposed

any practice made an unlawful employment practice . . . under [Title VII]."  42 U.S.C. 2000e-3(a).

Retaliation claims brought under Title VII are evaluated under the *McDonnell Douglas* burden-

shifting analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Cook v. CBS, Inc.*,

47 F. App'x 594, 596 (2d Cir. 2002); *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, 2006 WL 2642415,

22

at *22 (D. Conn. Sept. 13, 2006).  To establish a *prima facie* case of retaliation, plaintiff must establish that: (1) she engaged in a protected activity; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000).

If the plaintiff sets out a *prima facie* case, then the burden of production shifts to the defendants to articulate a legitimate, non-retaliatory rationale for their actions.  *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991).  If the defendants proffer a legitimate, non-retaliatory reason, the burden of production then shifts back to the plaintiff to introduce evidence that the defendants' reason was a pretext for retaliation.  *Id.*  The burden of proof and persuasion remains at all times with the plaintiff.  *Milano v. Astrue*, 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008).

### A.    Plaintiff's *Prima Facie* Case

Defendants argue that plaintiff cannot satisfy the third or fourth prongs of her *prima facie* case.  (Defs. Mem. Supp. Summ. J. at 18.)  Presumably, then, defendants concede that plaintiff has established the first two prongs of her *prima facie* case, namely that: (1) she engaged in protected activity; and (2) MortgageIT was aware of her participation in the protected activity.  For the purposes of this motion, we assume that plaintiff has satisfied the first two prongs of her *prima facie* case.

### 1.    Materially Adverse Employment Action

The purpose of the Title VII anti-retaliation provision is to prohibit employer actions that

23

would deter a reasonable employee from reporting discriminatory behavior. *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 208 (2d Cir. 2006). Therefore, "the anti-retaliation provision of Title VII, unlike Title VII's substantive provision, is *not* limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 207 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)) (internal quotation marks and alterations omitted; emphasis in original). Rather, to prevail on a claim for retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citation omitted.) However, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience" because such actions have no legally cognizable deterrent effect. *White*, 548 U.S. at 68. The standard is objective; whether a particular action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (internal quotation marks and citation omitted).

Plaintiff alleges that the following three actions by defendants were retaliatory: (1) the June 7 Warning; (2) plaintiff's transfer to the Stamford Office[26]; and (3) harmful and false statements made to Gega about plaintiff. (Pl. Mem. Opp. Summ. J. at 26-27.) The allegation that defendants

---

[26] Plaintiff also refers to her "termination" by defendants. (Pl. Mem. Opp. Summ. J. at 26.) It appears that plaintiff characterizes her transfer as a termination. As we already address whether her transfer was retaliatory, we need not address whether she was terminated or whether the termination, to the extent it occurred, was retaliatory.

made derogatory comments to Gega cannot form the basis of plaintiff's retaliation claim because, as we discuss below, in our evaluation of plaintiff's claim of intentional interference with prospective economic advantage, no admissible evidence establishes that those statements were ever made. However, the June 7 Warning and plaintiff's transfer to the Stamford Office could dissuade a reasonable employee from engaging in protected speech and, therefore, with respect to those allegations, plaintiff has satisfied the third prong of her *prima facie* case.

### a.     The June 7 Warning and Plaintiff's Transfer to the Stamford Office

Defendants argue that neither the June 7 Warning nor plaintiff's transfer to the Stamford Office was adverse because neither "affected the terms and conditions of her employment." (Defs. Mem. Supp. Summ. J. at 21-22.) This argument is flawed because an adverse employment act under Title VII's anti-retaliation provision, unlike Title VII's substantive provision, is not limited to acts that change the terms and conditions of employment. *Kessler*, 461 F.3d at 208.  Rather, because a warning notice, together with an involuntary transfer to a different office, both of which occurred immediately after plaintiff engaged in protected speech, may well dissuade a reasonable employee from making a Title VII complaint, it is proper for a jury to decide whether these were adverse employment acts. *See Cruz v. Liberatore*, 582 F. Supp. 2d 508, 524 (S.D.N.Y. 2008).

### 2.     Causation

We now consider whether plaintiff has met the fourth prong of her *prima facie* case, causation. "Proof of causal connection can be established *indirectly* by showing that the protected

activity was followed closely by discriminatory treatment, . . . or through other evidence such as

disparate treatment of fellow employees who engaged in similar conduct, . . . or *directly* through

evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester*

*County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (emphasis in original; citations omitted).

Plaintiff reported the Clothing Tag Incident to MortgageIT on May 26, 2004.  Eleven days

later, plaintiff received the June 7 Warning.  Twenty days after plaintiff reported the Clothing Tag

Incident, on June 16, 2004, plaintiff was told that she was being transferred to the Stamford Office.

Based on the temporal proximity of these events, a reasonable jury could infer that defendants gave

plaintiff the June 7 Warning and transferred her to the Stamford Office because of her complaints.

*See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (one-month gap between

protected activity and adverse employment action is "sufficient to establish the required causal link

for a prima facie case");  *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*, 2008 WL

2971467, at *12 (S.D.N.Y. July 31, 2008) (less than one month between complaint and adverse

employment action is sufficient to support finding of causal connection); *Monclova v. City of New

York*, 2008 WL 822117, at *8 (E.D.N.Y. Mar. 26, 2008) (one-month lapse between discrimination

complaint and adverse employment action, "[o]n its own," could create inference of causation).

Defendants argue that reliance on temporal proximity is inappropriate where "'gradual

adverse job actions began well before the plaintiff had ever engaged in any protected activity.'"

(Defs. Mem. Supp. Summ. J. at 24 (internal citation omitted).)  However, defendants have not

submitted any evidence of adverse job actions occurring prior to plaintiff's protected activity.

Defendants also argue that there should be no inference of causation with respect to the decision to

transfer plaintiff to the Stamford Office because "Cohen lost trust in [p]laintiff . . . in April 2004."

26

(*Id*. at 26.) This is unpersuasive because, assuming Cohen's trust in plaintiff was gradually eroded, nothing in the record indicates that the ultimate decision to transfer plaintiff to the Stamford Office preceded plaintiff's protected speech. (*See* Cuti Aff. ¶ 11.) Accordingly, we find that the evidence is sufficient to raise a genuine issue of fact as to whether there was a causal connection between the alleged adverse actions suffered by plaintiff and plaintiff's complaint about Schulman. Therefore, plaintiff has set forth a *prima facie* case of retaliation.

### B.     <u>Defendants' Legitimate, Non-Retaliatory Reason</u>

As plaintiff has established a *prima facie* case of retaliation, the burden shifts to defendants to provide a legitimate, non-retaliatory reason for its actions. Defendants aver that plaintiff received the June 7 Warning because of "her substandard work performance, including her insubordinate conduct in connection with the termination of Ms. Trifelleti . . . , the hiring of Vivian Smith . . . , her frequent breaks, and the fact that only one loan officer was willing to work with her." (Defs. Mem. Supp. Summ. J. at 27.) Likewise, defendants aver that they transferred plaintiff to the Stamford Office for a legitimate, non-retaliatory reason, specifically "because [p]laintiff's working relationship with [] Cohen had become strained and the Stamford [O]ffice had a need for a [p]rocessing [m]anager." (*Id*. at 28.) We agree that these reasons are legitimate and non-discriminatory.

### C.     <u>Pretext</u>

Because defendants have proffered legitimate, non-discriminatory reasons for their actions, the burden now shifts to plaintiff to prove that these reasons are merely a pretext for retaliation. "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played

no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (internal quotation marks and citation omitted). The plaintiff may rely upon the same evidence that comprised her *prima facie* case, "depending on how strong [that evidence] is." *Id.* at 124.

There are questions of fact regarding the veracity of the statements in the June 7 Warning. Defendants aver that it is improper to rely only on the "fact that an employee disagrees with her employer's assessment of her work" to establish pretext. (Defs. Mem. Supp. Summ. J. at 27.) This is not, however, the only indication of pretext in this case. The legitimate, non-retaliatory reasons that defendants provide regarding the June 7 Warning are events that occurred during the spring of 2004. While the record does not provide exact dates for these events, it does not appear that any occurred after plaintiff's protected speech on May 26, 2004. A jury may find it curious that defendants did not issue a warning regarding past behavior until several days after plaintiff engaged in protected speech and, therefore, may find that her protected speech was at least one of the motivating factors in the June 7 Warning.

Likewise, a jury may find that plaintiff's protected speech was a motivating factor in the decision to transfer her to the Stamford Office. While defendants aver that plaintiff was transferred because of "ongoing concerns with [p]laintiff's performance, much of which . . . pre-dated [p]laintiff's complaint about [] Schulman," (Cuti Aff. ¶ 10), a jury may find it improbable that, if the sole reasons for transferring plaintiff existed before plaintiff complained about Schulman, defendants would have waited until plaintiff complained of Schulman and then involuntarily transfer her shortly thereafter.

28

Because a jury may find that defendants' proffered reasons for the June 7 Warning and for plaintiff's transfer to the Stamford Office were merely a pretext to retaliate against plaintiff for her protected speech, defendants' motion for summary judgment as to plaintiff's retaliation claim is denied.

## IV.    Retaliatory Termination and Defamation Through Conspiracy Under the NYHRL

"To establish its claim of civil conspiracy, the [plaintiff] must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 673 (S.D.N.Y. 2007) (Conner, J.) (alteration in original; internal quotation marks and citation omitted).

Plaintiff alleges that "[t]he facts show that Pappas, Cohen, Schulman and Gorman were in agreement that [] [p]laintiff was causing all the problems in the office.  Together they informed [h]uman [r]esources and provided a warning notice on June 7, 2004 consisting of complaints about [p]laintiff for the first time."  (Pl. Mem. Opp. Summ. J. at 26.)

However, there is no evidence before to the Court from which a fact finder could conclude that there was any agreement between two or more parties to retaliate against plaintiff by terminating her employment or by defaming her.  Plaintiff has submitted no evidence to establish that any individual other than Cohen or Holmes (who is not a defendant) was involved in the June 7 Warning.  Likewise, the only evidence presented to the Court indicates that Pappas, in consultation with MortgageIT's attorney, decided to transfer plaintiff to the Stamford Office.  (*See* Cuti Aff. ¶ 11;

29

Holmes Aff. ¶ 24.)  Finally, as described in the next section, no admissible evidence indicates that any defendant ever spoke to Gega regarding plaintiff in a defamatory way.  Plaintiff cannot meet her burden to prove that defendants engaged in a conspiracy to retaliate against her by terminating her employment or by defaming her, and therefore, her claim cannot withstand the instant motion for summary judgment.[27]  Plaintiff's claim of retaliatory termination through conspiracy is dismissed.


**V.      Intentional Interference With Prospective Economic Advantage**

To maintain an action for intentional interference with prospective economic advantage under New York law, plaintiff must demonstrate that (1) she had a business relationship with a third party; (2) defendants knew of the relationship and intentionally interfered with it; (3) defendants acted exclusively out of malice or used dishonest, unfair or improper means; and (4) defendants' interference with the relationship caused injury to that relationship.  *Pasqualini*, 498 F. Supp. 2d at 670-71.

Plaintiff states that defendants "prevent[ed] [p]laintiff from obtaining gainful employment with Countrywide . . . by intentionally giving . . . Gega a negative reference after he had offered [p]laintiff a managerial position with a yearly salary of approximately $120,000.00." (Pl. Mem. Opp. Summ. J. at 27.)  Defendants argue that we must grant summary judgment because Gega and defendants deny that Gega ever spoke to any individual at MortgageIT regarding plaintiff and, therefore, plaintiff cannot prove the second element of her claim.  (Defs. Mem. Supp. Summ. J. at 32.)

---

[27]  Because plaintiff has not set forth any evidence establishing an agreement, we need not resolve the underlying question of whether plaintiff was fired or resigned.

Plaintiff's allegation that she was offered a job by Gega is unsupported by any documentary evidence on the record. To the extent plaintiff relies on a statement that Gega made to her, that statement is hearsay and inadmissible. Any such statement would also conflict with Claroni's sworn statement that Gega "was going to hire her, [but] could not do so," though that statement is also hearsay. (Claroni Aff. ¶ 3.) Likewise, the only evidence that plaintiff has set forth in support of her allegation that defendants provided a negative reference to Gega are statements that plaintiff and Claroni aver that Gega made to each of them. (*Id.* ¶ 4; Pasqualini Aff. at 5.) Both statements are hearsay and, therefore, inadmissible. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (hearsay is not competent evidence and, thus, cannot be considered on a summary judgment motion). Plaintiff has not submitted any admissible evidence, circumstantial or otherwise, tending to prove that defendants actually interfered with any relationship that she had with Gega, and, for this reason, there is no issue of fact for a jury to decide. Rather, the only admissible evidence regarding this claim and, therefore, the only evidence that a jury would be able to consider, has been submitted by Gega and defendants, all of whom deny that any such conversation occurred. Because plaintiff has failed to present admissible evidence tending to establish one of the required elements for her claim of intentional interference with prospective economic advantage, this claim cannot survive the motion for summary judgment.

## VI.   **Abandoned Claims**

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Cruz*, 582 F. Supp. 2d at 528 (internal quotation marks and citation omitted). In this case, defendants

have moved for summary judgment on all of plaintiff's claims, including: (1) *quid pro quo* sexual harassment in violation of Title VII against MortgageIT; (2) *quid pro quo* sexual harassment in violation of the NYHRL against MortgageIT, Schulman, Pappas and Cohen; (3) intentional infliction of emotional distress against Schulman; (4) defamation *per se* against MortgageIT, Pappas, Schulman and Cohen; (5) slander *per se* against MortgageIT, Schulman, Pappas and Cohen; (6) libel *per se* against MortgageIT; (7) battery against Schulman; and (8) assault against Schulman.  In her opposition to the instant motion, plaintiff has failed to respond to any of defendants' arguments in support of their motion for summary judgment on these claims.  Therefore, we deem these claims abandoned by plaintiff and grant defendants' motion for summary judgment with respect to these claims.  *See, e.g.*, *Jessamy v. City of New Rochelle, New York*, 292 F. Supp. 2d 498, 515 n.21 (S.D.N.Y. 2003) (Conner, J.).

## VII.   Back and Front Pay Damages

Defendants have also sought to strike plaintiff's claim for back and front pay damages based on her refusal to accept the transfer to the Stamford Office or, in the alternative, move that plaintiff's damages be limited so that they exclude the time period after which MortgageIT would have eliminated her job due to its closure. (Defs. Mem. Supp. Summ. J. at 36-39.) Plaintiff has failed to respond to this argument in any way, and defendants contend that, due to this failure to respond, the Court should strike plaintiff's claim for back and front pay damages.  We decline to do so.  Unlike our treatment of the substantive claims that plaintiff failed to support against defendants' motion for summary judgment, we find it improper to limit the amount of damages that plaintiff may recover for her remaining substantive claims based on a failure to brief that issue.  We do not hold that

32

plaintiff is entitled to back and front pay damages, rather, we decline to limit her damages absent full briefing.

**VIII.   Plaintiff's Motion for Sanctions and Defendants' Cross Motion for Expenses**

Rule 11 permits sanctions to be imposed on an attorney for filing a claim containing frivolous legal arguments or factual allegations utterly lacking in evidentiary support. *See O'Brien v. Alexander*, 101 F.3d 1479, 1488-90 (2d Cir. 1996). Sanctions may be imposed where court papers have been signed, filed, submitted or later advocated for an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" or where "the claims, defenses, and other legal contentions are [not] warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(1)-(2). If a court determines that Rule 11 has been violated, it "may impose an appropriate sanction on any attorney, law firm, or party that violated [the subdivision] or is responsible for [the] violation." FED. R. CIV. P. 11(c)(1). The purpose of the statute is to deter unnecessary delays in litigation and bad faith is the "touchstone of an award under [the] statute." *Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 357 (S.D.N.Y. 2002) (internal quotation marks and citation omitted; alteration in original). Courts will generally infer bad faith "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *ACLI Gov't Secs., Inc. v. Rhoades*, 907 F. Supp. 66, 68 (S.D.N.Y. 1995) (internal quotation marks and citations omitted). A court's power to impose sanctions under Rule 11 is "discretionary rather than mandatory," and sanctions "should be imposed with caution." *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir. 1994). Rule 11 also provides that reasonable expenses and

33

attorneys' fees incurred by the prevailing party in presenting or opposing the motion may be imposed on the losing party. FED. R. CIV. P. 11(c)(2).

Plaintiff seeks sanctions on the basis that "there [are] so many questions of fact [that] exist in this matter" that summary judgment could not be appropriate and that "whatever the motivating force [behind bringing the motion] was is clearly outside of any rational [pursuit] of defenses of the [d]efendants." (Maria Aff. at 1-2.) Meanwhile, defendants argue that plaintiff's motion for sanctions was "patently improper" and in "bad faith," so that this Court should "order [p]laintiff's counsel to pay [d]efendants' expenses" in responding to the motion. (Defs. Mem. Opp. Cross-Mot. at 2.)

The majority of defendants' arguments were unopposed by plaintiff, and, therefore, the claims were deemed abandoned by the Court and dismissed. We cannot say that defendants' arguments with respect to the claims that this Court dismissed were without merit. Further, while we did not dismiss all of plaintiff's claims, none of defendants' arguments were so clearly without merit that they did not require an in-depth analysis of the record and the law as it relates to this case. Finally, nothing in the record supports a finding that defendants brought the instant motion for summary judgment in bad faith or to harass. Accordingly, plaintiff's motion for Rule 11 sanctions is denied, and defendants' request for expenses associated therewith is also denied.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. #56) is granted in part and denied in part.

Summary judgment is granted with respect to the following claims, all of which are

34

dismissed with prejudice and without costs or attorneys' fees: Count II: creation of a hostile work environment in violation of the New York Human Rights Law ("NYHRL"), with respect to defendants Mark Pappas and Cheryl Cohen only; Count III: *quid pro quo* sexual harassment in violation of Title VII against MortgageIT; Count IV: *quid pro quo* sexual harassment in violation of the NYHRL against MortgageIT, Richard Schulman, Pappas and Cohen; Count IX: intentional infliction of emotional distress against Schulman; Count XII: retaliatory termination and defamation through conspiracy against MortgageIT, Pappas, Schulman, Cohen and Patricia Gorman; Count XIII: intentional interference with prospective economic advantage against MortgageIT, Pappas and Cohen; Count XIV: defamation *per se* against MortgageIT, Pappas, Schulman and Cohen; Count XV: slander *per se* against MortgageIT, Schulman, Pappas and Cohen; Count XVI: libel *per se* against MortgageIT; Count XVII: battery against Schulman; and Count XVIII: assault against Schulman.

All claims against defendant Gorman are dismissed with prejudice and without costs or attorneys' fees.

Summary judgment is denied with respect to the following claims: Count I: creation of a hostile work environment in violation of Title VII against MortgageIT; Count II: creation of a hostile work environment in violation of NYHRL against MortgageIT and Schulman; and Count V: retaliation in violation of Title VII against MortgageIT.

Defendants have not moved for summary judgment with respect to Count XI: wrongful termination in violation of the NYHRL against MortgageIT, Pappas and Cohen, and, therefore, that claim remains.

Plaintiff's motion for sanctions (Doc. #67) is denied.

35

Counsel shall confer as to the steps required to resolve the matter and shall appear, by telephone if they so desire, for a conference on August 10 at 10:00 a.m. in Courtroom 12A at 500 Pearl Street.

SO ORDERED.

Dated: New York, New York
       August 3, 2009

Loretta A. Preska
United States District Judge